697 So.2d 1364 (1997)
ALPHA ALPHA, INC. & Travelair Charters, Inc. d/b/a Travelair, PlaintiffsAppellees,
v.
SOUTHLAND AVIATION, West Calcasieu Managing Board, et al., DefendantsAppellants.
No. 96-928.
Court of Appeal of Louisiana, Third Circuit.
July 9, 1997.
*1366 John Michael Veron, Lake Charles, for Alpha Alpha, Inc. et al.
Kevin Richard Tully, Lance Read Rydberg, New Orleans, for Southland Aviation, et al.
Before SAUNDERS, PETERS and AMY, JJ.
PETERS, Judge.
This is a suit for property damage arising out of an incident in which a 1984 Fairchild 300 aircraft was driven by an unknown person or persons off of a paved ramp and into a ditch at Southland Field Airport in Sulphur, Louisiana, on or about January 2, 1994. The owner and the lessor of the aircraft brought suit to recover their damages from the owners and the manager of the airport and the airport's liability insurer. The trial court found the defendants liable for the plaintiffs' damages under the theory of deposit, and the defendants have appealed. The plaintiffs have answered the appeal, seeking additional compensation.

DISCUSSION OF THE RECORD
The aircraft involved in this litigation is a twin-engine turboprop aircraft manufactured by Fairchild Aircraft Company and is referred to as a Merlin. At the time of the incident, the aircraft was owned by Alpha Alpha, Inc. (Alpha), an Oregon corporation. Alpha had purchased the aircraft from Associated Aircraft Sales Co., Inc. (Associated) and had leased it to Travelair Charters, Inc. (Travelair), a corporation having a business office location at Hobby Airport in Houston, Texas. These corporations were closely interrelated, and Larry Barbernell was the sole shareholder and president of all three.
On December 30, 1991, the Merlin was flown from its normal location in Texas to Southland Field Airport in Sulphur, Calcasieu Parish, Louisiana, for the sole purpose of avoiding payment of Texas ad valorem taxes that would otherwise be imposed at the beginning of the new year. Steven Weintraub, a sales representative for Associated, had previously visited Southland Field and made arrangements to bring several airplanes, including the Merlin, to the airport before the first of the year. According to Mr. Weintraub, he requested hangar space but was informed that the hangars were being remodeled and were not available. He testified that he then discussed with Catherine Miller Schreve, the airport manager at the time, the possibility of parking the airplanes on the ramp and explained to Ms. Schreve that the airplanes were expensive. *1367 According to Mr. Weintraub, Ms. Schreve assured him that the field was a secure one. Although Mr. Weintraub did not initially pay to park the airplanes at Southland Field, he testified that he and Ms. Schreve discussed that he would pay her for the tie-down fees when they returned to fly the aircraft back to Texas and that Ms. Schreve said, "Fine."
While Ms. Schreve acknowledged that hangar space was not available in late 1991 due to repair and renovation work, she testified that it was Mark Daigle, an airport lineman, who initially spoke to Mr. Weintraub. She did acknowledge, however, that she spoke to Mr. Weintraub at a later time concerning arrangements for the airplanes. Mr. Daigle also testified that he, and not Ms. Schreve, first spoke to Mr. Weintraub. Mr. Daigle testified that he told Mr. Weintraub that the airport had no established security, but he assured Mr. Weintraub that a parish deputy would patrol the area and would check the airport facility.
Ms. Schreve testified that she received a phone call from Mr. Daigle concerning his conversation with Mr. Weintraub. According to Ms. Schreve, Mr. Daigle informed her that Mr. Weintraub requested that the aircraft be parked on the south ramp but she instructed Mr. Daigle to offer the front ramp. Ms. Schreve also testified that in a later conversation, Mr. Weintraub did not ask her to provide any security for the airplanes and that Southland Field has never charged a tiedown fee for the storage of airplanes. She admitted, however, that Mr. Weintraub did tell her that he would discuss paying a tiedown fee or buying fuel at a later time. She testified that she simply smiled in response.
On December 30, 1991, the Merlin and two other aircraft were flown to Southland Field and were parked on the south ramp, which is the ramp farthest from the airport buildings. The testimony is conflicting on whether the pilots chose the south ramp or whether they were directed there by airport personnel. Additionally, the testimony is conflicting on whether any of the airplanes were tied down. An airport lineman did chock the wheels of all three aircraft. Mr. Weintraub testified that he personally secured each aircraft before he left the airport and that when he left they were locked.
Southland Field is a public-use airport. The West Calcasieu Port, Harbor and Terminal District (West Calcasieu) and the Industrial Development Board of the City of Sulphur (Development Board) own the airport. The West Calcasieu Airport Managing Board d/b/a Southland Aviation (Southland Aviation) manages the airport. United States Fire Insurance Company (USFIC) is the general liability insurer for the airport.
At the time the Merlin arrived, the airport's normal operating hours were from 6:00 a.m. to 10:00 p.m., but the runway was open twenty-four hours a day. Because the runway was open at all times, access to and from the airport was always available through an unlocked pedestrian gate. However, no airport personnel were employed to remain on the premises after 10:00 p.m. The airport's night security consisted of fencing and outside lighting. Additionally, the airport relied on the routine patrols conducted throughout the parish by the sheriff's department. On either the night of January 2, 1992, or the morning of January 3, 1992, an unknown individual or individuals entered the Merlin, started it, and ran it into a ditch. The Merlin remained at Southland Field after the incident, and on May 26, 1992, it was again entered and vandalized by an unknown person or persons.
In this suit, Alpha and Travelair named West Calcasieu, the Development Board, Southland Aviation, and USFIC as defendants. Prior to filing this suit, Alpha and Travelair had filed suit in Texas against the insurer of the aircraft, United States Aircraft Insurance Group (USAIG).[1] Chase Manhattan Bank, which originally financed the purchase of the aircraft, was also a party to that litigation. In the Texas suit, the plaintiffs sought to recover not only for the damage to the Merlin but also punitive damages under Texas law for the alleged bad faith handling of the claim by USAIG. This suit was ultimately *1368 settled with USAIG paying $1,400,000.00, being the policy limit. Chase Manhattan Bank received $1,100,000.00 of that amount, and Alpha and Associated received the remaining $300,000.00.
Subsequent to the Texas settlement, the emphasis of the litigation shifted to the Louisiana action. After a bench trial, the Louisiana trial court concluded, among other things, that the defendants were compensated depositaries and that they failed to exonerate themselves from liability. The trial court then awarded the plaintiffs damages for the cost of repair, the loss of use, and the traumatic depreciation of the aircraft. The damages award totaled $510,384.61.
The defendants have appealed, contending that the trial court erred in (1) denying their exceptions of no right of action and failure to join USAIG as an indispensable party; (2) holding that the airport was a depositary of the plaintiffs' aircraft; (3) including in the damages award for the cost of repair an amount for the purchase price of the aircraft; (4) denying the defendants' exception of no right of action regarding federal preemption in connection with airport security; and (5) failing to recognize that Southland Aviation was immune from liability under the discretionary function doctrine of La.R.S. 9:2798.1. The plaintiffs have answered the appeal, contending that the damages award is inadequate.

OPINION

Subrogation
The defendants contend that the trial court erred in denying their exceptions of no right of action and failure to join an indispensable party regarding the subrogation of the plaintiffs' cause of action to USAIG, the insurer of the Merlin.
Alpha, Travelair, and Associated concluded the Texas litigation by entering into a settlement with USAIG and others for the face amount of the USAIG policy. The defendants contend that USAIG became subrogated to all of the plaintiffs' rights against third parties for physical damage to the aircraft when USAIG paid pursuant to the settlement. Thus, the defendants contend that USAIG, rather than the plaintiffs, was the proper party to pursue the claim for property damage.
La.Code Civ.P. art. 697 provides:
An incorporeal right to which a person has been subrogated, either conventionally or by effect of law, shall be enforced judicially by:
(1) The subrogor and the subrogee, when the subrogation is partial; or
(2) The subrogee, when the entire right is subrogated.
Official Revision Comment (c) of that article provides in part that "[i]f there has been a total subrogation and the suit is brought in the name of the subrogor, the latter has no right of action, and the court cannot adjudicate in the absence of the indispensable party plaintiffthe subrogee."
The USAIG policy provides in part:
If we pay a claim under this policy, we will take over your right to recover that amount from any other person or organization. You agree not to do anything that will interfere with our chances of recovery and agree to cooperate with us.
However, in this case, Alpha and Associated had filed suit in Texas against USAIG and others, not only for policy proceeds for property damage to the aircraft, but also for other items of damages and attorney fees associated with causes of action which included breach of contract, breach of the duty of good faith and fair dealing, violation of the Texas Insurance Code, and deceptive trade practices. While it is true that USAIG paid $1,400,000.00 under the settlement, that settlement did not state that the payment was only for property damage to the aircraft. Indeed, the settlement provides in part that "[t]he Parties desire to settle all matters in dispute in ... the Texas Action." It is not clear exactly what amount of the $1,400,000.00, if any, was for property damage. Thus, we cannot determine if a "claim" was paid under the policy that would give rise to conventional subrogation.
In any event, USAIG assigned all of its rights back to the plaintiffs. The settlement provides in part:

*1369 3. USAIG shall assign to Alpha and Travelaire all claims, causes of action, choses in action, subrogation rights or any and all rights whatsoever that USAIG may hold against the Defendants in the Cause No. 92-5125, styled "Alpha Alpha, Inc. and Travelaire Charters, Inc. d/b/a Travelaire vs. Southland Aviation, West Calcasieu Managing Board and Aviation Adjustment Bureau", pending in the 14th Judicial District Court of Calcasieu Parish, Louisiana (the "Louisiana Action"), it being the intent of this assignment that Alpha and Travelaire shall have ownership of all claims that are or could be brought in the Louisiana Action.
The assignment document provides in part:
Now, therefore, for the receipt of good and valuable consideration the receipt and sufficiency of which is [sic] hereby acknowledged, USAIG hereby assigns to Alpha and Travelaire any and all claims, demands, rights of action, causes of action, choses of action, subrogation rights, both conventional and legal, or any other rights which USAIG may have as a result of the insurance contract between the parties as described above and the damages to the aircraft insured.
Under this settlement and assignment, USAIG relinquished its subrogation rights through the assignment. Thus, it was not an indispensable party to the action. La.Code Civ.P. art. 698(2) provides that an incorporeal right which has been assigned shall be judicially enforced by the assignee when the entire right is assigned. Therefore, the plaintiffs, as assignees, had the right to bring the action against the defendants.
The defendants also contend that the plaintiffs did not appear in the Louisiana action as assignees of any rights which they purportedly acquired from USAIG by assignment but appeared solely as the owner and lessor of the aircraft. Thus, the defendants contend that the plaintiffs did not legally assert any claim against them which they may have obtained as assignees. However, the defendants have not filed any exceptions or pleadings which might have allowed them relief in this regard, and having found that the plaintiffs have a right to bring the action, the defendants cannot now be heard to challenge the capacity in which the plaintiffs asserted that right.
Therefore, we conclude that this assignment of error is without merit. The trial court did not err in rejecting the defendants' exceptions of no right of action and failure to join an indispensable party.

Deposit
The trial court found that a relationship of deposit had been created concerning the aircraft and that the deposit relationship was a compensated one rather than a gratuitous one. The defendants contend that the trial court erred in this regard.
In general, a deposit is an act by which a person receives movable property of another and binds himself, expressly or implicitly, to preserve it and return it in kind. La.Civ. Code art. 2926; Harper v. Brown & Root, Inc., 391 So.2d 1170 (La.1980). The chief requisites for the formation of a relationship of deposit are the mutual consent of the parties and the delivery of the property. La.Civ.Code arts. 2930 and 2932; Harper, 391 So.2d 1170. The requisite consent is implied when the owner delivers the thing to the depositary, who, having knowledge of the delivery, has not refused to receive it. La. Civ.Code art. 2933; Grabert v. James C. Noel Flying Serv., Inc., 360 So.2d 1363 (La.App. 3 Cir.), writ denied, 363 So.2d 536 (La.1978).
The case of Coe Oil Service, Inc. v. Hair, 283 So.2d 734 (La.1973), is dispositive of this issue. In that case, the issue was whether the defendant's act of agreeing to let the plaintiff park its airplane overnight on its premises constituted a deposit requiring the defendant to safeguard the deposited property or whether the plaintiff was merely a business invitee requiring the defendant to exercise only ordinary care. The plaintiff's airplane had been forced to land at the airport due to bad weather, and one of the defendant's employee's, whose duty it was to attract incoming private airplanes to its facilities for refueling and other services, waived the airplane to the defendant's area. The plaintiff's president inquired about tiedown facilities, had the airplane filled with *1370 gas, and taxied it to a spot on the defendant's leased premises. An employee of the defendant secured the airplane for the night. The defendant's office employee and lineman assured the plaintiff's president that the airplane and its contents would be safe. The defendant's employees testified that normally no tie-down fee was charged when an airplane was refueled at the facility. Rather, the profit on the fuel and the expectation of future business were adequate consideration for the tie-down service. During the night, an unknown person taxied the airplane down the field and wrecked it in a ditch. The supreme court found that the defendant's act of receiving the property bound it as a depositary.
In the instant case, the facts are very similar to Coe Oil Service, Inc. It is not disputed that arrangements were made with Southland Field personnel for the Merlin to be brought to Southland Field to avoid the payment of Texas ad valorem taxes. In fact, the evidence reveals that the airport actually anticipated and accommodated the arrival of the Merlin. Additionally, there is no question of delivery.
The defendants contend that Coe Oil Service, Inc., is distinguishable because in that case the defendant was a for-profit fixed-base operator, whereas Southland Field is not a privately-owned business but a public facility. Additionally, the defendants contend that Coe Oil Service, Inc., is distinguishable in that because Southland Field is a public-use airport built with public funds, the defendants could not refuse the plaintiffs the use of the airport. Therefore, the defendants contend, the requisite mutual intent to create the deposit did not exist.
The defendants have not cited us to any authority to show that a public-use airport cannot be a depositary, and we have found none. We do note that the fourth circuit in Lewallen v. Board of Levee Commissioners, 166 So.2d 566 (La.App. 4 Cir.1964), while not specifically addressing the issue, found that a political subdivision that operated an airport was a depositary under the facts of that case. In any event, we need not reach the issue of whether a public-use airport can be a depositary where the airport merely allows an aircraft to land and park temporarily because it cannot refuse to do so, since that is not the situation in the case at hand. Rather, the facts of this case reveal that the airport was actively, not passively, involved in making the arrangements for the arrival and parking of the aircraft. Specifically, Mr. Weintraub made arrangements with Southland Field personnel prior to the arrival of the aircraft. Additionally, the airport lineman chocked the wheels and, according to the testimony of Mr. Weintraub, instructed the pilots as to where to park the aircraft on the ramp. While some of the testimony is conflicting, we find no manifest error in the trial court's credibility determination in this regard. Also, according to the testimony of Mr. Weintraub, he was concerned about security and airport personnel assured him that the aircraft would be safe. We also note that Southland Field sold fuel and leased hangar and office space. Clearly, Southland Field was operating for profit. Under the facts of this case, we find that the record supports the trial court's determination that a depositary relationship existed, and we find that this determination is not clearly wrong.
A contract of deposit is essentially gratuitous. La.Civ.Code art. 2929. However, compensation may be given. Coe Oil Serv., Inc., 283 So.2d 734. La.Civ.Code art. 2937 provides that "[t]he depositary is bound to use the same diligence in preserving the deposit that he uses in preserving his own property." However, our jurisprudence has determined that this obligation of safekeeping is more rigorously enforced against one who is a compensated depositary. Coe Oil Serv., Inc., 283 So.2d 734. Once it is established that a compensated deposit exists and that there is a loss of or damage to the property while deposited, a presumption is raised that the loss resulted from lack of due care on the depositary's part and the burden is then on the depositary to exonerate himself from fault. Id.
Compensation for accepting the deposit of a thing does not have to consist of a storage fee but may consist of some other economic advantage received by the depositary as part of the consideration for accepting the deposit. Id. In Coe Oil Service, *1371 Inc., the defendant's compensation was the sale of gas and the expectation that the airplane's owner would be a repeat customer. According to the defendant, this was considered adequate compensation for the overnight tie-down service. Under these facts, the supreme court found that the defendant was a compensated depositary.
In the instant case, the testimony was not disputed that a purpose of the airport was economic development. The testimony was conflicting as to whether a tie-down fee was to be charged. Mr. Weintraub testified that after the accident he asked Ms. Schreve how much they owed her for the tie-down fee and that she said that she "felt real bad" about what had happened to the Merlin and she did not want to charge them a tie-down fee. Mr. Barbernell's son, Stephen, who went to the airport after the accident, testified that someone brought a check to the airport to pay tie-down fees, and his testimony confirmed Mr. Weintraub's testimony regarding Ms. Schreve's response to the suggestion of payment for the tie-down fees. Additionally, the Aircraft Owners and Pilots Association publication, AOPA's AVIATION USA,[2] indicates that Southland Field charged tie-down fees. The trial court credited the testimony of Mr. Weintraub and Stephen Barbernell, and we find no manifest error in this regard. The plaintiffs did not purchase fuel, but Mr. Weintraub indicated that normally they probably would have put some fuel in the Merlin as a courtesy. Since the defendants received an economic advantage as part of the consideration for accepting the Merlin, the trial court was not clearly wrong in finding that the defendants were compensated depositaries.
Thus, the issue is whether the defendants exonerated themselves from fault in causing the damage to the aircraft. In Coe Oil Service, Inc., the supreme court noted that while the defendant cited the fence, lights, and security guard as being adequate precautions for the safekeeping of the airplane and as showing it afforded due care, the defendant produced no direct evidence to prove that the cause of the loss was other than its failure as depositary to safeguard the property.
In the instant case, while the testimony indicates that the airport had fencing and outside lighting and that the defendants relied on routine sheriff patrols conducted throughout the parish, the defendants produced no direct evidence to prove that the cause of the loss was other than its failure as a depositary to safeguard the airplane. We find no manifest error in the trial court's determination that the defendants failed to exonerate themselves from fault in causing damage.

Federal Preemption
By this assignment of error, the defendants contend that Congress has preempted the field of airport security through its legislation and authorization of federal aviation regulations on airport security. The defendants therefore contend that state courts cannot require additional or different security measures and that the effect of the trial court's judgment is to require such.
As conceded by the defendants at trial and on appeal, the preemption argument does not apply to the theory of deposit but to the alternative theory of liability for negligence. Having affirmed the trial court's finding that the airport was a depositary of the Merlin, we need not address this argument, and we find this assignment to be without merit.

Discretionary Function Doctrine
The defendants contend that the decision on the need for security provided the aircraft at Southland Field was a decision made at the ministerial level by Southland Aviation, the airport managing board, and that the board is immune from liability under the discretionary function doctrine of La.R.S. 9:2798.1, which they assert that the trial court incorrectly failed to recognize.
La.R.S. 9:2798.1(B) provides:
Liability shall not be imposed on public entities or their officers or employees *1372 based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
The supreme court has adopted a two-part test for determining when the discretionary function exception applies. Archon v. Union Pac. R.R., 94-2728, 94-2743 (La.6/30/95); 657 So.2d 987. First, the court must determine whether the government's action was a matter of choice. Id. If the action was not a matter of choice because some statute, regulation, or policy prescribed a specific course of action to follow, then the exception does not apply and there is no immunity. Id. If, on the other hand, the action involved an element of choice or discretion, then the court must determine whether that discretion is the type that is shielded by the exception because it is grounded in social, economic, or political policy. Id. It is only those actions that are based on public policy that are protected by La.R.S. 9:2798.1. Id.
In the instant case, the political entity defendants had the discretion to decide whether to operate the airport and receive incoming aircraft. We anticipate the defendants' argument that they had no choice but to accept incoming aircraft because they are a public-use airport. Be that as it may, in the instant case, they made the decision to operate the airport as a public-use airport and specifically to become a depositary of the Merlin. Once that decision was made, the defendants had no choice but to abide by applicable legal standards in discharging that function. Since there was no choice involved, the exception does not apply and there is no immunity. As suggested in Fowler v. Roberts, 556 So.2d 1 (La.1989), there is a difference between exercising discretion and abdicating responsibility. Thus, we reject this assignment of error.

Damages
The trial court awarded the plaintiffs $510,384.61, which represents damages for the cost of repair of the aircraft, for the loss of use of the aircraft for seven months, and for the traumatic depreciation of the aircraft. The plaintiffs have answered the appeal, requesting that the judgment be modified (1) to increase the award for physical damage to the aircraft from the cost of repair ($436,000.00) to the difference between the pre-accident value of the aircraft ($1,100,000.00) and its salvage value after the accident ($200,000.00), or $900,000.00, and (2) to increase the award for loss of use of the aircraft by calculating the loss of use from the date of the accident to the date of the trial. The defendants seek a reduction in the award for the cost of repair, asserting that the award included the $200,000.00 purchase price.
When property has been damaged through the legal fault of another, the primary goal is to restore the property as nearly as possible to the condition that it was in preceding the damage. Coleman v. Victor, 326 So.2d 344 (La.1976). Generally, in assessing damage to property, courts have considered the cost of restoration to be the proper measure of damage where the thing damaged can be adequately repaired. Id. No mechanical rule can be applied with exactitude, but each case must rest on its own facts and circumstances. Id. However, if a vehicle is a total loss, the plaintiff-owner is entitled to the market value of the vehicle before the accident less its salvage value, if any. See id.
It is not disputed that the value of the aircraft before the accident was $1,100,000.00. William F. Bergenty purchased the damaged aircraft from USAIG almost one year and eight months after the accident for $200,000.00. Mr. Bergenty had the aircraft repaired, and he testified to a repair cost of $436,000.00, but that figure included his purchase price. He resold the aircraft for $850,000.00.
Obviously the aircraft was capable of being repaired, and the plaintiffs do not contend that it was not adequately repaired. Indeed, Mr. Bergenty testified that after the repairs were completed, the aircraft was certified to FAA airworthiness standards. Rather, the plaintiffs rely on testimony by Kerry Porter, a claims adjuster for USAIG, who testified that the aircraft was written off as a total loss.
However, we note that USAIG solicited bids to repair the aircraft and obtained estimates from six companies, including estimates of $834,000.00, the bidder having never *1373 attempted a repair of this magnitude; $657,775.00, the bidder having withdrawn the bid after the owner insisted that the bulkhead be changed; $611,963.60, the estimate reflecting replacement of damaged parts with all new parts and reflecting ample coverage for hidden damage; $324,291.00, the bidder having a primary business focus in regional airline heavy maintenance and structural repair, especially in the Fairchild line of equipment; $319,994.00; and $196,349.39, this figure representing a bid on the airframe repairs only.
Thus, despite USAIG's decision to classify the aircraft as a total loss, the evidence shows that the repair estimates submitted to USAIG were less than the aircraft's value prior to the accident. Furthermore, according to Mr. Porter, USAIG did not repair the aircraft because the insured refused to authorize repairs. Mr. Barbernell admitted that he did not ever authorize anyone to repair the airplane. It appears that the reason for the refusal to authorize repairs was that Mr. Barbernell wanted the repairs to be made with new parts. Importantly, Mr. Bergenty actually had the aircraft repaired for a total of $236,000.00, which amount included parts, labor, and his regular business expenses. Therefore, under the facts of this case, we do not find that the trial court was constrained to rely on USAIG's classification that the aircraft was a total loss. We find no error in the trial court's use of the cost of repair as the measure of damages in this case.
The defendants seek a reduction in the award of $436,000.00, asserting that this amount included the $200,000.00 purchase price. The trial court used Mr. Bergenty's figure of $436,000.00, but Mr. Bergenty testified that this amount included the $200,000.00 purchase price. Thus, the trial court erred in including that amount as a cost of repair, and we reduce that item of damages to $236,000.00.
The trial court limited the award for loss of the use of the aircraft to seven months. According to Mr. Bergenty, the actual repairs took seven or eight months. We note that at least three of the repair estimates were submitted the same month the damage occurred. Additionally, the record indicates that Mr. Barbernell refused to authorize repairs because he wanted to use new rather than replacement parts. Loss of use is compensable during the period required to repair the vehicle in the exercise of proper diligence. Russell v. Lloyd's Towing Serv., Inc., 381 So.2d 896 (La.App. 2 Cir. 1980). In light of the foregoing, we find no manifest error in the trial court's decision to limit damages for the loss of the use of the aircraft to seven months.

DISPOSITION
For the foregoing reasons, we amend the judgment of the trial court to decrease the award of damages for the cost of repair from $436,000.00 to $236,000.00. We affirm the judgment in all other respects. We assess fifty percent of the costs of this appeal to the plaintiffs and fifty percent to the defendants.
AFFIRMED AS AMENDED.
AMY, J., concurs.
NOTES
[1] USAIG is managed by United States Aviation Underwriters, Inc., which is referred to in the record. However, for the sake of convenience, we will use USAIG in this opinion to refer to the insurer of the aircraft.
[2] AOPA's AVIATION USA is an annual publication that provides members of the aircraft community with information regarding the airports listed in the publication. For example, the publication provides information such as pattern altitudes, approaches, runways, and fees.