STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

CA 04-692


FRED LEE PERKINS

VERSUS

WURSTER OIL CORP., ET AL.


**********

APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, NO. C-2001-088
HONORABLE PATRICIA C. COLE, DISTRICT JUDGE

**********

**JOHN D. SAUNDERS**
**JUDGE**

**********

Court composed of Sylvia R. Cooks, John D. Saunders, and Oswald A. Decuir, Judges.

**Cooks, J., concurs in the result.**

**REVERSED.**


**John Craig Jones**
**Attorney at Law**
**131 Hwy 165 South**
**Oakdale, LA 71463**
**(318) 335-1333**
**Counsel for: Plaintiff/Appellant**
**Fred Lee Perkins**

**David R. Rabalais**
**Attorney at Law**
**P. O. Drawer 54024**
**Lafayette, LA 70505**
**(337) 289-6555**
**Counsel for: Defendant/Appellee**
**Wurster Oil Corp.**

**James David Cain, Jr.**
**Lundy & Davis**
**P. O. Box 3010**
**Lake Charles, LA 70602**
**(337) 439-0707**
**Counsel for: Plaintiff/Appellant**
**Fred Lee Perkins**

**SAUNDERS, J.**

The issues on appeal to this court arise from an accident occurring when Plaintiff was filling his automobile with gasoline. Fred Perkins stopped at a gas station to fill his truck. While the process was ongoing, static electricity ignited the fuel vapors. Mr. Perkins was burned by the fire and filed suit alleging that he was never warned of the dangers of static electricity and that the pump was improperly grounded.

**FACTS**

The facts of this case are largely undisputed. On March 4, 2000, Fred Perkins stopped at a convenience store in Oakdale, Louisiana, the "Stop & Shop," to fill his truck with gasoline. Mr. Perkins was accompanied by Corey Fontenot and Josh Domingue. Upon arrival at the Stop & Shop, Plaintiff pulled up to a pump and turned off his truck. Mr. Fontenot went inside to pay for $15.00 worth of gas and Plaintiff got out of the vehicle to begin pumping the gasoline. Mr. Perkins put the nozzle into his tank and engaged the automatic dispenser level. As the fuel was being pumped, Plaintiff re-entered the cab of the truck. Apparently, he sat down to flip through some of his compact discs. When the gauge on the pump reached $13.00, Plaintiff got out of the vehicle so that he could stop it at $15.00.

Plaintiff claims that he touched the bed of his truck before he reached for the nozzle; however, Defendant contests this allegation. Essentially, this is the only disputed fact in the case. Plaintiff then reached for the nozzle and a spark ignited the gas vapors. Both parties agree that the spark was caused by static electricity. Plaintiff then jerked the hose away from his truck and he was sprayed with gas and caught on fire. Because he was trapped between the open truck door and the flames

at the rear of his truck, Plaintiff crawled through the vehicle to the other side. A bystander pushed him to the ground and extinguished the flames.

The fire produced a small area of third degree burns surrounded by an area of second degree burns with first degree burns at the edges. Plaintiff was treated twice at Oakdale Community Hospital before beginning treatment at the LSU Burn Center in Shreveport on March 7, 2000. After his initial visit to Shreveport, Plaintiff returned to the burn center once a week for follow-up examinations and dressing changes. By the beginning of May 2000, the majority of Plaintiff's wounds had healed. The area of skin covered by third degree burns, however, had not. Plaintiff underwent skin graft surgery to replace that area on May 8, 2000 and has permanent scars from the burns.

**PROCEDURAL HISTORY**

Suit was filed against Wurster Oil Corporation, Petron Inc., and Trinity Universal Insurance Company on September 16, 2001. Plaintiff alleged that the static electricity emanated from the pump and that Defendants failed to warn him of the dangers posed by static electricity. Trial on the merits began on December 1, 2003 in the Thirty Third Judicial District Court. The jury found in favor of Defendants and a judgment to that effect was signed on January 2, 2004. Plaintiff filed a Motion for New Trial and a Motion for JNOV, both of which were denied. Plaintiff has now appealed.

**ASSIGNMENTS OF ERROR**

1) The jury's findings of fact were "manifestly erroneous." The record reflects that there is no reasonable factual basis for the findings of the

trial court. The record establishes that the findings of the trial court regarding the liability of the Defendants, Wurster Oil and Petron, Inc., is "clearly wrong."

2) The trial judge committed reversible error as a matter of law in not instructing the jury regarding the doctrine of *res ipsa loquitur*. Failure of the trial judge to properly instruct the jury contributed to the verdict, for the jury charges as a whole did not adequately provide the correct principles of law as applied to the issues framed in the pleadings and presented at trial so as to properly guide the jury in its deliberations.

3) The trial judge erred in failing to strike the testimony of James Roberts and admonishing the jury to disregard his testimony after he testified regarding documents (blueprints/schematics) of the subject pump and gas dispensing system after the Defendants were sanctioned for failing to comply with a judgment on Plaintiff's Motion to Compel in failing to produce these documents, which were the basis of Mr. Roberts' testimony which constituted unfair surprise and trial by ambush.

4) The trial judge erred by denying Plaintiff's Motion for JNOV and/or New Trial based upon Defendants' complete disregard for the rules of discovery and in failing to produce documents that Plaintiff sought pre trial, including blueprints and schematics upon which Mr. Roberts' testimony was based. Defendants were ordered to comply with Plaintiff's Motion to Compel and, thereafter, were sanctioned for violating the Court's judgment on Plaintiff's Motion to Compel. In

addition, the evidence, as a whole, clearly established the Defendants' liability for the fire that caused Plaintiff's injuries.

**LAW AND ANALYSIS**

The standard of review for findings of the trial court has been clearly established in this circuit. A court of appeal may not set aside a judge's factual finding unless that finding was manifestly erroneous or clearly wrong. *Stobart v. State, through Dep't Of Transp. & Dev.*, 617 So.2d 880 (La.1993). "Absent 'manifest error' or unless it is 'clearly wrong,' the jury or trial court's findings of fact may not be disturbed on appeal." *Sistler v. Liberty Mut. Ins. Co.*, 558 So.2d 1106, 1111 (La. 1990). "If the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id*. at 1112. Furthermore, when reviewing questions of law, appellate courts are to determine if the trial court's ruling was legally correct or not. *Cleland v. City of Lake Charles*, 01-1463 (La.App. 3 Cir. 3/5/03), 840 So.2d 686, *writ denied*, 03-1380, 03-1385 (La. 9/19/03), 853 So.2d 644, 645. Because our holding regarding Plaintiff's second assignment of error pretermits a discussion regarding other assignments, we will address it first.

**ASSIGNMENT OF ERROR NUMBER 2**

In *Cangelosi v. Our Lady of the Lake Regional Medical Center*, 564 So.2d 654 (La.1990), on rehearing, our supreme court examined the doctrine of *res ipsa loquitur*. That court explained that *res ipsa loquitur* permits a factfinder to examine the circumstances surrounding an incident and infer negligence on the defendant's

part. *Id*. It assists a plaintiff in presenting a prima facie case when direct evidence is not available. *Id.* For *res ipsa loquitur* to apply, "the injury must be of the type which does not ordinarily occur in the absence of negligence." *Id*. at 666. This means that a person of ordinary experience would, given the nature of the incident, infer negligence. *Id*. Knowledge common to the community is the basis for determining if the injury is one from which an ordinary person would infer negligence. *Id*.

In addition to establishing that the injury suffered does not normally occur in the absence of negligence, a plaintiff must show that the negligence of someone other than the defendant is not a more probable cause of the injury and that the negligence was within defendant's duty to the plaintiff. *Id.* A showing that the injury causing instrumentality was under the defendant's control is generally sufficient to demonstrate that the defendant's negligence was within the scope of his duty to the plaintiff. *Id*.

In *Cangelosi*, the supreme court also set forth the criteria trial courts are to use when determining whether or not to instruct the jury on the doctrine of *res ipsa loquitur*. *Id*. The trial judge should give a *res ipsa* instruction if he finds that reasonable persons could reach different conclusions regarding the negligence of the defendant as implicated by the circumstances surrounding the event. *Id*. Stated another way, the trial judge must instruct on *res ipsa* unless "the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable men could not arrive at a contrary verdict." *Id*. at 666-67. It is the jury's job to decide if the inference permitted by *res ipsa loquitur* should be drawn. *Id*.

In *Granger v. Guillory, et al.*, 01-1539, 02-83 (La.App. 3 Cir. 6/5/02), 819 So.2d 477 *writ denied*, 02-1841, 02-1826 (La. 10/4/02), 826 So.2d 1132, this court examined the supreme court's decision in *Cangelosi*. We noted, as did the supreme court in *Cangelosi*, that *res ipsa loquitur* is a rule of circumstantial evidence that fills the gap in a negligence case when there is no direct evidence available to the plaintiff. *Id*.

We believe that *res ipsa loquitur* is applicable to the current matter. First, we conclude that the injury suffered by Plaintiff does not occur in the absence of negligence. Frankly, people are not supposed to burst into flames when they put gas in their vehicles. Additionally, due to the conflicting nature of the evidence presented at trial, we find that reasonable people could reach different conclusions regarding Defendants' possible negligence. Accordingly, we feel that the trial judge erred in not instructing the jury on *res ipsa loquitur*. Because we believe that this error of law skewed the findings of material fact and pretermits other issues on appeal, we will render judgment based upon the record before us after applying the corrected law and determining the essential facts de novo. *Lasha v. Olin Corp.,* 93-0044 (La. 10/18/93), 625 So.2d 1002.

We must first decide whether the inference of negligence permitted by *res ipsa loquitur* should be made. This determination must be based upon an examination of the factors set forth by the supreme court in *Cangelosi* and applied by this court in *Granger*. First, this injury does not normally occur in the absence of negligence. Ordinary experience tells us that people generally do not emit sparks, ignite fuel vapors, and catch on fire when using a gasoline pump. Being set on fire while

performing a task as routine as fueling a vehicle indicates that someone must have been negligent. Second, in order to warrant the *res ipsa* inference, Plaintiff must sufficiently exclude his own responsibility for the accident. The supreme court has determined that, unless the "facts and inferences point so strongly and overwhelmingly" in Defendants' favor, the finder of fact should determine whether or not the *res ipsa* inference is proper. *Cangelosi*, 564 So.2d at 666-67. We believe Plaintiff's testimony that he touched the bed of his truck before reaching for the nozzle is sufficient to shift the burden to Defendants. The facts and inferences in this matter simply do not overwhelmingly favor Defendants. Finally, Defendants' negligence must be within the scope of his duty to Plaintiff. The fact that Defendants were in exclusive control of the gasoline pump indicates that Defendants' negligence was, in fact, within the scope of the duty to Plaintiff.

In addition to the fact that we believe this injury does not happen in the absence of negligence, we find that the *res ipsa* inference is appropriate because some of the physical evidence bearing on this case was either destroyed or discarded. Defendants maintain that they had the entire pumping apparatus, from the ground to the tip of the nozzle, tested four days after the incident and no defects were found. By the time Plaintiff secured an expert and had him travel here to examine the pumping apparatus, the hose, swivel and nozzle had been removed and discarded. Defendants were sanctioned for the spoliation of this evidence. Defendants attempt to explain these actions by claiming that Plaintiff never requested this evidence be preserved; however, we find this unpersuasive. First, Defendants should be aware that this evidence should have been made available to Plaintiff. Second, if the tests run by

Defendants truly did indicate that they were not liable for the accident, why would they not want to preserve this evidence? *Res ipsa loquitur* is a rule of circumstantial evidence available to a plaintiff when direct evidence is not present. Based on our belief that this type of accident doesn't occur in the absence of negligence and the lack of direct evidence, we infer negligence on Defendants' part. After inferring negligence, we will examine the facts to determine if this inference was rebutted. Both parties agree that the spark causing the fire occurred in the area where Plaintiff's hand touched or got closest to the nozzle. The spark must have emanated from this area because static electricity can only jump, or arc, over a very small distance. Accordingly, the most logical place for this to occur was between Plaintiff's hand and the nozzle because they were in very close proximity, if not touching. While they agree on where the spark arose, the parties disagree on its source. Plaintiff blames an improperly ground dispensing system but Defendant argues that the spark resulted from the build up of static electricity on Plaintiff while he was in the truck during the fueling process.

Plaintiff's expert, Mike Schultz, examined Mr. Perkins' truck and determined that its fuel system was not the cause of the static spark. Additionally, Mr. Schultz examined the fabric on the interior of the truck as well as Plaintiff's clothes to determine if either produced the static electricity. He found both materials to be poor conductors of electricity; therefore, he excluded them as possible sources of the static electricity. This left the dispensing system as the only possible source of the electric charge. In further support of his contention, Mr. Schultz noted that there was no spark when Plaintiff initially approached the pump. If Plaintiff was the source of the

electricity, Schultz concluded, he would have felt a spark the first time he got out of his truck. Accordingly, Mr. Schultz surmised that the static electricity originated in the dispensing system. This conclusion is in harmony with the fact that gasoline, by virtue of its physical properties, generates significant amounts of static electricity as it flows through pipes. Mr. Schultz' testimony that static electricity is created when gas flows through a closed system, such as a gas pump, was uncontradicted; therefore, it is logical to assume that the dispensing system was the source of the static electricity resulting in the spark.

Plaintiff also claims that when he exited the vehicle for the second time he put his hand on the bed of the truck before reaching for the nozzle. This is significant because if, in fact, static electricity built up on Plaintiff's person it would have dissipated when he touched the metal bed of the truck. This means that if static electricity was present it could only have come from the gas pump. Defendants argue that Plaintiff is lying about this fact in order to establish liability on their part. Given the circumstances of Plaintiff's initial exit from the vehicle, we find this debate to be irrelevant. Plaintiff left the door to his truck open and only had to touch the non-metallic instruments to open his door and exit the vehicle. Plaintiff, however, never experienced a static electricity spark, or arc, at any time when he initially exited the vehicle. Therefore, even assuming Defendants are correct and Plaintiff did not touch the bed when he exited the second time, they offer no explanation as to why static electricity would have built up on Plaintiff while sitting in his truck during the fueling process but not when driving to the station. The only difference between the first and second time Plaintiff approached the pump is that gas was flowing through it the

-9-

second time. It has already been established that this process generates static electricity.

Defendants called only one witness on their behalf who addressed the static electricity issue. James Roberts, a maintenance supervisor for Petron, Inc., offered no explanation regarding the fact that Plaintiff experienced no static spark or arc when he initially exited his vehicle. Rather, he testified that he checked the electrical continuity of the pump four days after the accident. Mr. Roberts claims that the entire system was continuous, meaning that static electricity could not have built up because the pump was properly grounded. Again, it should be noted that Plaintiff was never able to test the entire system, or even just the hose, swivel and nozzle, for electrical continuity. Mr. Roberts further testified that, if the pump had not been properly grounded, it may have exhibited technical problems. No such problems were reported on the day of the accident. We find that this testimony falls short of explaining the aforementioned discrepancy regarding the fact that Plaintiff did not experience any static electricity when he originally left his vehicle, which would be expected if he were the source of the static. Unfortunately, we cannot be certain because the evidence is not available.

Even if the pump itself was not the source of the static spark, as contended by Defendants, they must nevertheless bear responsibility because Plaintiff was never warned that it was possible for static electricity to accumulate on his person and ignite the gasoline vapors. The evidence indicates that the pump contained a warning against smoking and leaving the vehicle running. There was no warning, however, regarding the possibility that the person using the pump could, themselves, be a

source of fire when fueling their vehicles. Business customers are invitees and, as such, are owed ordinary care. *Alpha Alpha, Inc. v. Southland Aviation*, 96-928 (La.App. 3 Cir. 7/9/97), 697 So.2d 1364. Accordingly, if it is possible for customers to generate a charge that will ignite gas vapors simply by sitting in their cars, they should be warned. The common experience of the motoring public simply does not comprehend that motorists can ignite such a dangerous fire by merely sitting in their vehicles. Here, Plaintiff contends that it is extremely unlikely that he was the source of the spark given the fact that both his clothing and the interior of his truck are poor conductors of electricity. Regardless of whether or not Plaintiff is correct, he should have been warned if this danger exists. Not only would such a warning protect Plaintiff, it would protect everyone else on the premises because a gasoline fire at a gas station puts everyone there in extreme danger.

When the gravity of harm that may be suffered in these situations is considered, it becomes obvious that a reasonably prudent owner of such equipment would warn of this danger, regardless of how remote it might be. The victim basically bursts into flames when this hazard is realized. Furthermore, everyone on the premises is endangered because of the volatile nature of gas fires. Accordingly, it becomes apparent that inviting people to use your gas pumps but not informing them that merely sitting in their car could lead to this kind of situation is a breach of the duty of ordinary care.

After finding Defendants liable for the injuries sustained by Mr. Perkins, we now turn to the apportionment of damages. As owner of the pump at issue in this matter, Petron had the duty to guarantee that the pump was in working order and to

warn customers of potential hazards associated with its use. Due to the fact the Defendants discarded some of the physical evidence in this matter without all parties having the opportunity to examine it, it is impossible to definitively determine whether Plaintiff or the pump was the source of the static electricity. It is clear, however, that no warning was provided to Plaintiff. Petron is responsible for placing appropriate warnings on their own pumps; therefore, we conclude that Petron is entirely at fault. Plaintiff has incurred $11,025.05 in past medical expenses and faces future medical costs of $9,693.00 for surgery and related treatments to repair the damaged portions of Plaintiff's skin. Additionally, we award Plaintiff general damages for past and future pain and suffering in the amount of $150,000.00.

**CONCLUSION**

We reverse the trial court's decision refusing to instruct the jury on *res ipsa loquitur*. This error skewed the jury's verdict; therefore, we conducted a *de novo* review of the record. We find in favor of Plaintiff and award $11,025.05 for past medical expenses, $9,693.00 for future medical expenses, and $150,000.00 for past and future pain and suffering. All costs of this appeal are to be assessed against Petron, Inc.

**REVERSED.**