821 So.2d 39 (2002)
Donald NYQUIST
v.
JEFFERSON PARISH SHERIFF'S OFFICE & Shawn Michel.
No. 01-CA-1378.
Court of Appeal of Louisiana, Fifth Circuit.
May 15, 2002.
*40 Robert J. Caluda, Stephen C. Juan, New Orleans, LA, for Plaintiff/Appellant.
Edmund W. Golden, Golden & Fonte, Metairie, LA, for Defendants/Appellees.
Panel composed of Judges JAMES L. CANNELLA, THOMAS F. DALEY, and SUSAN M. CHEHARDY.
DALEY, Judge.
This case stems from an accident that occurred on February 13, 1998, during the moving of the floats for the Krewe of Atlas Parade. The floats were in a warehouse on Tchoupitoulas Street and had to be moved to the parade staging area in Metairie. The Jefferson Parish Sheriff's Office provided deputies to escort the float movement. While the procession was proceeding on Loyola Avenue, the plaintiff, Donald Nyquist, attempted to cross the street and was struck by a motorcycle operated by Deputy Shawn Michel. Plaintiff sustained severe injuries, including the loss of his left leg. He filed suit against the Jefferson Parish Sheriffs Office (hereinafter JPSO) and Deputy Shawn Michel. The plaintiff has appealed the trial court's judgment in favor of defendants. For the reasons which follow, we affirm.

FACTS:
The plaintiff contends JPSO was negligent in the route selection in that there were safer alternate routes and this route was unsafe because of the large number of pedestrians in the area in light of the fact that the procession passed through the Central Business District at lunch time. The plaintiff argues the escort was manned with an inadequate number of officers, Deputy Michel was negligent for failing to yield to the pedestrian-plaintiff and failing to warn the plaintiff that he was approaching, operating his motorcycle at an excessive rate of speed, and failing to take evasive maneuvers to avoid striking plaintiff.
Captain Mark Dupuis of the JPSO was called by the plaintiff on cross examination. He had worked in the motorcycle division since 1985 and supervised escorts. He had participated in float movements for 16 years. Captain Dupuis testified that the procession left the warehouse on Tchoupitoulas and proceeded down Poydras, turned right on Loyola Avenue, left on Tulane Avenue, then proceeded to Jefferson Davis Parkway to Earhart Expressway *41 to Metairie. The procession consisted of the 18 floats, 13 motorcycles, a lead car, and a tail car. He explained that the motorcycles would "leapfrog" from the back of the procession to the front of the procession to block intersections along the way. Captain Dupuis testified that it was safe for Deputy Michel to travel at 30 to 35 miles per hour during the leapfrog.
Captain Dupuis testified that this same route was used every year and each year the route was reviewed for possible changes. He explained that JPSO is not in complete control of the time the procession takes place because the time has to be coordinated with the float builder. He stated that although pedestrians are always a concern during float movements, he did not think a different time would have been safer because all of the cars and motorcycles in the procession have their lights and sirens on. Captain Dupuis testified that there were an adequate number of officers for this movement and it could have been safely performed with fewer officers. He stated that JPSO had not made any changes in float movement procedure as a result of this incident.
Officer Mark Ducote of the New Orleans Police Department (hereinafter NOPD) testified that he investigated this accident. He stated that there was a single line of floats in the center lane of this three-lane street. Deputy Michel was traveling in the middle part of the left lane when he struck plaintiff. There was no pedestrian cross walk in this area. He stated that based on his investigation Deputy Michel was traveling under the 35 miles per hour speed limit when the accident occurred. He stated that the skid marks indicate that Deputy Michel was in a "hard braking" situation at the time of impact. He concluded that the float prevented the plaintiff and Deputy Michel from seeing each other before plaintiff entered the left-hand lane of traffic.
Defendant, Deputy Shawn Michel, testified that he had previously participated in float movements in this area using the same route. He estimated that he was traveling at 30 to 35 miles per hour when plaintiff ran in front of him. He swerved and braked, but was unable to avoid striking plaintiff. Deputy Michel explained that he was traveling in the left part of the left lane and moved to the right as plaintiff appeared. The left saddlebag struck plaintiff. The impact caused the motorcycle to go down. Deputy Michel testified that he had his strobe lights, flashing yellow lights, and siren activated at the time of the accident. He stated that all motorcycles in the procession had their lights and sirens on. He testified that no disciplinary action was taken against him as a result of this accident and there was nothing he could have done to avoid striking the plaintiff.
Raymond Burkhardt, who was accepted by the court as an expert in accident reconstruction, general vehicle safety techniques, and Mardi Gras float movements and escorts, testified on behalf of plaintiff. Mr. Burkhardt spent 31 years with the NOPD in the traffic division. He testified that pedestrian traffic is a major concern in conducting float movements and that people always try to cross the street between the floats and get confused because there are so many sirens. He testified that an alternate route with less pedestrian traffic would have been safer. He further testified that an earlier or later time outside of the lunch hour would have decreased the amount of pedestrian traffic in the area. Mr. Burkhardt further testified that 35 miles per hour was an unsafe speed for this situation and the fastest Deputy Michel should have been traveling was 20 to 25 miles per hour. At this lower speed *42 the motorcycle is easier to maneuver and requires less stopping distance.
Mr. Burkhardt testified that this procession was one to two motorcycles short for the traffic control and four to five motorcycles short for the pedestrian control. These extra motorcycles should have been interspersed between the floats for pedestrian control. He opined that the lead vehicle did not gauge the speed correctly because the caravan of floats should not have stopped. Pedestrians try to cross the procession when it is stopped. On cross-examination, Mr. Burkhardt admitted that he had not determined if the floats would have fit under the overpasses on the alternate route because he had not received information regarding the height of the floats.
The plaintiff, Donald Nyquist, testified that he was from Montana and had spent three months in the fall of 1997 in Honduras in an attempt to save his marriage. He came to New Orleans in December 1997 and stayed with his wife's relative. He later rented a room, then went to a homeless shelter. On the day of the accident, he was walking to the bus station on Tulane Avenue to get a ride to attend a job interview. Mr. Nyquist testified that the floats were stopped on Loyola Avenue and there were other pedestrians crossing in both directions between the floats. Mr. Nyquist testified that he saw Deputy Michel on the motorcycle with lights on, but "he was a ways up the street and didn't appear to be a threat." He explained that the fact that other people were crossing in the area made him underestimate the speed of the motorcycle. He did not recall hearing police sirens. He stated that he was unconscious after the accident and woke up at Charity Hospital in pain, confused, and afraid. He described his treatment, which included the insertion of pins in his leg and two bone grafts. An infection developed in the bone of his left leg that led to the amputation of this leg above the knee.
On cross-examination, Mr. Niquest testified that he was walking on the sidewalk and started to cross the street in the crosswalk, but the float was partially blocking the crosswalk so he had to go around the float. When viewing photographs of the accident site, Mr. Niquest admitted there was no crosswalk.
Mr. Niquest was questioned extensively regarding notations in his medical records indicating he had a history of drug and alcohol abuse. Mr. Niquest admitted to using alcohol and seeking treatment for alcohol abuse, but denied drug abuse. He denied that he had anything to drink or any drugs on the day of the accident. Blood tests performed following the accident revealed the presence of opiates and it was stipulated that this was due to a Tylenol with codeine taken the day prior to the accident.
Major Richard Kron, Jr., the commander of the traffic division of the JPSO, testified on behalf of the defendants. He testified that he planned the float movements including the route and the number of officers. He stated that the route suggested by plaintiffs expert, Mr. Burkhardt, could not have been used because there was construction underneath the overpass and the floats would not have fit under the overpass. He stated that NOPD uses the same route used by the Jefferson Parish floats through the central business district to conduct float movements. Major Kron testified that the number of officers and vehicles was adequate to move the 18 floats and he could think of no reason why 20 officers would be needed as suggested by Mr. Burkhardt. He stated that there are pedestrians on every route and that 30 to 35 miles per *43 hour was not an unsafe speed for Deputy Michel to travel.
Mr. Fred Terluin, Jr., a retired sergeant in the NOPD, testified on behalf of the defendants. He worked in the traffic division on a motorcycle under Mr. Burkhardt and had participated in more than one hundred float movements. He testified that NOPD used this same route through the central business district in 1998 and conducted float movements between noon and 2:00 p.m. He stated that NOPD would have used 12 motorcycles when moving 18 floats, rather than 13 as JPSO used. He stated that it is not unsafe for an officer to travel 30 to 35 miles per hour when leapfrogging in this area. He further testified that he had never been instructed to lay a motorcycle down when confronted with an obstacle in his path.
Colonel Earl Morris, of the Utah Highway Patrol, was accepted as an expert in traffic safety procedures, policy, and procedures. Colonel Morris testified that he inspected the accident site and watched the movement of the Krewe of Atlas floats in February 2001. The 2001 movement was conducted in the same manner as the 1998 movement. He testified that there were no factors that made the movement unsafe. He explained that leapfrogging is used by motorcycle officers in many different States for parades, motorcades, and other events. He stated that the number of officers used in this float movement exceeded the number that would have been used in other parts of the country. He further stated that the use of additional officers, as suggested by Mr. Burkhardt, would have created a problem. He stated that Deputy Michel's speed was not a factor in this accident. Colonel Morris opined that the cause of this accident was the plaintiff who entered the street with marked police units with lights and sirens activated to warn pedestrians not to cross the street. He testified that the skid marks were consistent with Deputy Michel's testimony that he leaned right in an attempt to avoid plaintiff.
Captain Kerry Najolia, the assistant director of training for JPSO, was accepted as an expert in police procedure and policy. He testified that Deputy Michel's actions were consisted with JPSO policy. He stated there were an adequate number of officers to conduct the movement in a safe manner and that the route was safe. There were no changes made in float movement procedure as a result of this accident. Captain Najolia opined that 13 motorcycles with lights and sirens activated proceeding down the street with 18 floats is sufficient warning for a reasonable person to know it is not safe to cross the street.
Mr. Richard Turner was accepted by the court as an expert in accident reconstruction, police training, and policy. His testimony was in agreement with the testimony of the defendant's other experts that the route was safe, there were an adequate number of officers, Deputy Michel's speed was safe, and that the skid marks are consistent with Deputy Michel's testimony. Mr. Turner further testified that the fact that the floats were stopped was not relevant to the cause of the accident. He opined that the cause of the accident was plaintiff attempting to occupy the same space as Deputy Michel.
The deposition of Zonah Ford was introduced into evidence. Ms. Ford testified that the motorcycles had their lights and sirens on and plaintiff walked into the street and was struck by a motorcycle. She stated that plaintiff approached from the neutral ground side of the street. She testified that she was watching plaintiff and she knew he would not be able to cross.
*44 The deposition of the tractor driver of float 14, Billy Baxley, was introduced into evidence. Mr. Baxley testified the plaintiff came from the sidewalk side of the street. He stated that plaintiff just walked across the street and kept walking until the impact. The floats were stopped at the time of the accident. He stated that Deputy Michel leaned the motorcycle and missed plaintiff with the front wheel of the bike, but the rear saddle bag struck plaintiff. He further testified that the motorcycles all had on their lights and sirens. He testified that no one else crossed in front of him when he was stopped in front of the Holiday Inn.
In his extensive Reasons for Judgment the trial court acknowledged that the driver of a vehicle bears a greater responsibility to avoid striking a pedestrian; however, he noted that a pedestrian has a duty to exercise reasonable care when entering a roadway and must yield to the right-of-way of all vehicles in the roadway. The trial judge found, "that the plaintiff, and not the defendants, was the sole and proximate cause of the accident at issue for trying to cross Loyola Avenue without first ascertaining that it was safe to do so," and assessed 100% of liability for the accident against plaintiff.

LAW AND DISCUSSION:
The well-settled rule of law is that an appellate court cannot reverse a trial court's findings of fact in the absence of manifest error or unless they are clearly wrong. Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). On appeal, the appellate court must review the record in its entirety to determine whether the trial court's findings were clearly wrong or manifestly erroneous and whether the trial court's conclusions were reasonable. Stobart, supra.
If the trial court's findings are reasonable, based on the record, the appellate court may not reverse these findings, even if the appellate court feels that it would have reached a different conclusion had it been sitting as trier of fact. Lewis v. State, Through DOTD, 94-2370 (La.4/21/95), 654 So.2d 311. In Stobart, supra, the Supreme Court explained:
This Court has recognized that "[t]he reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts." Canter v. Koehring Co., 293[283] So.2d 716 (La.1973). Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Id.

Furthermore, it is presumed that the trial court judgment is correct and was decided in accordance with the law; the appellants have the burden of proving otherwise. When there are two opposing views of an accident, the reviewing court may assume that the trial court accepted the version of the accident that accords with its judgment. Karisny v. Sunshine Biscuits, Inc., 215 So.2d 201, (La.App. 3rd Cir.1968).
If this court had been the trier of fact, it may have concluded that Deputy Michel should share some liability for this accident; however, the testimony of all the witnesses in this case provides a reasonable factual basis for the trial court's finding that Mr. Nyquist was the sole and proximate cause of the accident. The record contains an abundance of expert testimony supporting the actions of JPSO and Deputy Michel. Considering the expert testimony as well as plaintiff's testimony *45 that he saw the flashing lights of the approaching motorcycle and continued to walk into the path of the motorcycle, we cannot say the trial court committed manifest error in finding that Mr. Nyquist was solely at fault in this accident. Accordingly, the judgment of the trial court is affirmed.
AFFIRMED.