840 So.2d 686 (2003)
Terry and Ruth CLELAND
v.
CITY OF LAKE CHARLES, et al.
Terry and Ruth Cleland
v.
City of Lake Charles, et al.
Nos. 02-805, 01-1463.
Court of Appeal of Louisiana, Third Circuit.
March 5, 2003.
Rehearing Denied April 16, 2003.
*688 John Bradford, Todd Ammons, Stockwell, Sievert, Viccellio, Clements & Shaddock, Lake Charles, LA, for City of Lake Charles and Gerard Jones.
Christopher P. Ieyoub, Plauche, Smith & Nieset, Lake Charles, LA, for Calcasieu Parish School Board and Washington National Insurance Company.
Thomas Lorenzi, David D. Palay, Jr., Lorenzi, Sanchez & Palay, L.L.P., Lake Charles, LA, Earl G. Pitre, Pitre, Halley & Sikich, Lake Charles, LA, for Terry E. Cleland and Ruth P. Cleland.
Thomas Justin Miller, Waller & Associates, Mandeville, LA, for Automobile Insurance Company of Hartford, Connecticut.
Court composed of ULYSSES GENE THIBODEAUX, MICHAEL G. SULLIVAN, and BILLY H. EZELL, Judges.
*689 THIBODEAUX, Judge.
In this personal injury case arising out of a motor vehicle accident involving an employee of the City of Lake Charles (the City) and Terry E. Cleland, the plaintiffs, Terry E. Cleland and Ruth P. Cleland, appeal a judgment of the trial court, entered pursuant to a jury verdict, which found Mr. Cleland to be thirty-one percent at fault in the vehicular accident and in awarding them what they consider to be abusively low medical expenses and general damages. They assail the decision of the trial judge to allow a biomechanics expert to testify on the issue of causation. The City's answer to the Clelands' appeal asserts that the trial court erred in assessing it with payment of one-hundred percent of the court costs and the jury erred in finding that it and Gerard Jones, the City employee involved in the accident with Mr. Cleland, to be sixty-nine percent at fault in causing the accident.
Mrs. Cleland, an employee of the Calcasieu Parish School Board (School Board), was covered by a health insurance policy issued to the School Board by Washington National Insurance Company (Washington National). The School Board and Washington National appeal the trial court's judgment in favor of the Clelands relieving them from reimbursement of medical bills it paid for the injuries suffered by Mr. Cleland in the accident. Further, the School Board asserts that the trial court erred in failing to declare that it no longer owes health insurance coverage to the Clelands. Further, it asserts that the amounts awarded by the jury for general damages and medical expenses were abusively low.
For the following reasons, we find that the trial judge erred in admitting the testimony of Dr. Scott Krenrich, the City's expert on biomechanics. The jury did not err in its apportionment of thirty-one percent fault to Mr. Cleland and sixty-nine percent fault to the City and Mr. Jones. Further, we find that, because the trial judge improperly admitted the testimony of Dr. Krenrich, and we cannot determine the weight the jury accorded his testimony in reaching its decision on the amount of damages, we remand the case to the trial court on the issue of damages. With respect to the School Board and Washington National's assignments of error, we find that the trial court did not err with regard to the health insurance coverage and reimbursement issues. We also conclude that the trial court correctly assessed court costs.

I.

ISSUES
We shall consider whether:
(1) the trial court erred in the admission of Dr. Krenrich's testimony;
(2) the allocations of fault to the parties were proper;
(3) the trial court erred in refusing to order the Clelands to reimburse the School Board and Washington National for the medical expenses they paid to the Clelands; and,
(4) the School Board no longer owes health insurance benefits to the Clelands.

II.

FACTS
The essential facts of the accident are not in dispute. On October 18, 1991, Mr. Cleland was driving a 1988 Ford Thunderbird automobile. At the same time, Mr. Jones was operating a pick-up truck owned by the City. Mr. Jones was in the course and scope of his employment with the City when he made a wide right turn and side-swiped the Cleland vehicle. Mr. Jones *690 looked down for a few seconds to pick up some papers that had fallen on the floorboard of the truck. Mr. Cleland attempted to avoid the impact by turning his vehicle to the right. The impact occurred in Mr. Cleland's lane of travel. The right tire of the Cleland vehicle came to rest in the yard next to his land of travel. Mr. Jones was ticketed for careless operation by the officer who investigated the accident.
At the time of the accident, Mr. Cleland had been under the care of Dr. Dean Moore, a neurosurgeon, for problems related to his lower back since 1981. Mr. Cleland admitted to a long history of lower back problems. In July 1986, Mr. Cleland underwent a lumbar laminectomy from which he recovered and returned to work in February 1987. However, by March 1987, Mr. Cleland complained of pain in his left buttocks. He continued to complain of pain and resumed care with Dr. Moore. Mr. Cleland did not go back to work until September 1987, when Dr. Moore released him to full duty. During this time Mr. Cleland was also seeing Dr. Harper Willis, a psychiatrist, who was deceased at the time of trial.
On August 23, 1988, Mr. Cleland was involved in a motor vehicle accident where he suffered a lumbar strain and concussion. By September 12, 1988, Mr. Cleland had recovered from his injuries and was again released to return to work at full duty. In January 1989, Mr. Cleland complained about severe headaches and being unsteady on his feet. The next time Mr. Cleland saw Dr. Moore about his low-back problems was on April 3, 1989, when Mr. Cleland informed the doctor that he tripped on some computer cords at work and twisted his back. Mr. Cleland also injured his foot and broke a tooth in the trip-and-fall accident.
Medical diagnostics tests revealed that Mr. Cleland suffered slight bulging of the disks and scar tissue from his previous laminectomy at L5-S1. An MRI revealed mild degenerative changes of the second, third, and fourth disk and annular bulging at the L4 disk. An EMG study, a test that shows the electrical activity of the muscles and nerves in the back and legs, revealed signs of root lesion on the right side of Mr. Cleland's back at the S1 level. By January 1990, Mr. Cleland still complained of back pain radiating down his left leg. However, by March 1990, Mr. Cleland's radiating pain reached his right leg. A myelogram was conducted on July 26, 1990, that revealed a mild to moderate anterior defect at L4-L5. Dr. Moore felt that Mr. Cleland would need more surgery on his back.
On October 4, 1990, Mr. Cleland underwent a second surgery for a laminectomy at the L4-L5 and a three level fusion of the L5-S1 vertebrae. Mr. Cleland saw Dr. Moore again on October 29, 1990, and he complained about some pain and stiffness in his back. Dr. Moore concluded that it was incisional pain and that Mr. Cleland was doing well. Mr. Cleland also told Dr. Moore about being involved in an accident that occurred in June 1990, prior to his surgery in October 1990. Mr. Cleland explained to Dr. Moore that he did not tell him about the June 1990 accident because he was afraid that workers' compensation would not pay for his surgery and that he was in pain and wanted the surgery done.
At his February 1991 visit with Dr. Moore, Mr. Cleland told the doctor that he had been doing well until he sneezed and experienced a sudden onset of pain in his low back that radiated to the back of his right leg with associated numbness and tingling. Since it was only four months post-operation, Dr. Moore suggested that *691 some time pass to see if the pain would subside. When he continued to complain about his low back pain in March 1991, Dr. Moore ordered diagnostic tests. An MRI revealed some scar tissue, mild effuse annular bulging, mild bilateral neural foraminal narrowing at L4-L5 and at L5-S1 it showed some scar tissue. A tomogram, a special type of x-ray conducted by Dr. R. Dale Bernauer, an orthopedic surgeon, showed that the fusion performed six months prior was solid.
Mr. Cleland continued to complain of pain, but his treating physicians did not think his pain could be relieved by further surgery. Thus, Mr. Cleland was referred to the Touro Clinic in New Orleans for pain management treatment. Mr. Cleland was evaluated at the Touro Clinic on June 5, 1991, and Dr. Moore recommended that he be accepted into the pain clinic. Mr. Cleland, however, was not accepted. Dr. Moore continued to treat Mr. Cleland and saw him in July 1991 and September 1991. During those visits, Mr. Cleland complained of increasing pain in his back and both legs. Dr. Moore was still attempting to get authorization for Mr. Cleland to be treated at the Touro Clinic. During an October 7, 1991 visit, Mr. Cleland continued to complain about his back and leg pain. In addition, he complained that his knee was in pain and that he experienced numbness in his face. The face numbness did not last very long.
Although at his last visit Dr. Moore recommended that Mr. Cleland return in two months, the doctor next saw Mr. Cleland on October 26, 1991, because he had been involved in the automobile accident that is the subject of this appeal on October 18, 1991. Dr. Moore testified that Mr. Cleland gave him the following history:
He said he didn't know if he hit his head on anything, but he thinks he was briefly unconscious immediately after the accident, only just a few seconds. He was dazed somewhat. Been having some headaches since then. They were located in the back of the head. Often they became generalized in nature. He also noted that light would tend to bother his eyes. He had some blurring of his vision. He's had decreased hearing in the left ear, but he had this before the accident and there seemed to be no change since the accident. Also said he'd been sleeping a lot since the accident. Had some dizziness and some weakness in his legs and numbness and tingling in his arms and hands. He's been having a frequency of urination but no incontinence of urine. Regarding his neck pain radiating in the back of the head in the interscapular area, there was no radiation of pain into the upper extremities. He's not had any weakness in the arms but the numbness and tingling in his arms and hands. Bending and twisting his neck about will tend to aggravate his neck pain.
He's had chest pain since the accident. Chest pains at times would feel like a tight band around his chest; at times it felt like a deep pain in the front part of his chest.
Regarding low back pain, it would tend to radiate to both legs so it felt it was burning. Pain in his legs, weakness in both legs, but no numbness and tingling in the legs. He had noted that bending and twisting, coughing and sneezing, riding in a car all would aggravate his complaints of pain in his back and legs. He underwentI reviewed the history of what we've already talked about.... Says he continues to have the back and leg pain. He complained of that on his October 7, '91 visit up until the time of the accident, but he said his back and leg pain had been worse since the accident of October 18. Said he had *692 had a concussion, mild neck injury in the past, but none in recent years, and not been having any headaches or neck pain or chest pain prior to this accident.
A CAT scan performed on October 30, 1991, revealed a bulging disk at L3-L4 and a clefta breakin the fusion at L4-L5. Mr. Cleland was hospitalized on November 19, 1991, for the purpose of having a myelogram and a CAT scan performed. The myelogram revealed the cleft as well as a herniated disk at the C6-C7 on the left of Mr. Cleland's neck. Dr. Moore testified that the herniated disk in Mr. Cleland's neck had not been seen before and that it corresponded with his complaints of tingling, numbness, and pain in his arm. Dr. Moore opined that the herniated disk in Mr. Cleland's neck occurred because of his motor vehicle accident of October 18, 1991. Dr. Moore further opined that the cleft in Mr. Cleland's back at the L4-L5 area was aggravated by the accident. Because Mr. Cleland's back fusion was not intact, Dr. Moore conducted additional back surgery.
On December 10, 1991, Mr. Cleland underwent the first surgery, a partial hemilaminectomy of the L4-L5 and L5-S1 disks, after the October 1991 accident. During the same surgery, Dr. Bernauer performed another three level lumbar fusion. Removal of the herniated disk in his neck at the C6-C7 level was done on March 3, 1992. Mr. Cleland was still in pain. Tomograms conducted in early June 1992, revealed that Mr. Cleland suffered from a residual cleft on the right side of his spine. Dr. Bernauer explained that the tomography results meant that one side was fixed by the December 1991 surgery and the other side was not. Dr. Bernauer further explained that Mr. Cleland's fusion was not stable. At this time, Mr. Cleland complained of severe low back and neck pain. Upon the recommendation of and referral by Dr. Bernauer in September 1992, Dr. Jeffrey Kozak, an orthopedic surgeon in Houston, Texas, performed a four level anterior posterior reconstruction surgery at the L2-L3, L3-L4, and L4-L5 disk spaces. During his recuperation from the September 1992 surgery, Mr. Cleland had to wear a lower body brace with a leg extension. Mr. Cleland developed foot problems as a result of walking in the brace. Dr. Kozak testified that this consequence is not unusual.
To correct the problem with his foot, Dr. Kozak referred Mr. Cleland to Dr. John O. Bishop, an orthopedic surgeon. Dr. Bishop found that Mr. Cleland had debris, arthritis, bone spurs, and scar tissue in the joints of his toes; thus, in April 1993 Dr. Bishop performed surgery. It was Dr. Bishop's opinion that Mr. Cleland's foot problems resulted from the October 1991 accident. Mr. Cleland's foot problems persisted. In October 1994, Dr. Bishop performed another surgery to fuse the joints of his right big toe. In March 1995, Dr. Bishop performed another surgery to remove screws previously placed in Mr. Cleland's right foot. The same surgery to the left foot was conducted in April 1995. Because the fusion of the joints in Mr. Cleland's big toes did not take, he underwent two more toe joint fusion procedures, the first in September 1995 and the second in November 1995 performed by Dr. Bishop's colleague, Dr. Grant Braley, also an orthopedic surgeon. Mr. Cleland's final and ninth surgical procedure post the October 1991 accident was performed by Dr. Bishop in February 1996 to remove the hardware in his right toe.
Mr. Cleland was treated by Dr. Harper Willis, a psychiatrist, prior to his October 18, 1991 accident. After Dr. Willis' death, Mr. Cleland continued his psychiatric treatment with Dr. Aretta Rathmell, who first saw him in September 1997 and diagnosed Mr. Cleland as suffering from dysthymia, *693 chronic depression, chronic pain syndrome, and depression secondary to his physical pain. It was Dr. Rathmell's opinion that Mr. Cleland is not trying to live his life through his lawsuit.
The defendants presented several witnesses who reviewed Mr. Cleland's medical records as well as the accident records. Dr. Scott Krenrich was qualified as an expert in the fields of emergency room medicine, physics, and biomechanical engineering. His testimony was essentially that the mechanical forces of the accident were insufficient to cause any of Mr. Cleland's injuries. Dr. Lynn Foret, an orthopedic surgeon who reviewed Mr. Cleland's medical records but did not treat him, opined that none of Mr. Cleland's medical problems were the result of the car accident. A psychiatrist, Dr. Edward Gripon, concluded that Mr. Cleland's psychiatric problems were unrelated to the accident. An accident reconstructionist called by the defendants testified that Mr. Cleland could have avoided the accident by stopping before impact.
In connection with Mr. Cleland's injuries in the accident, the School Board and its insurer, Washington National, sought reimbursement of medical expenses Washington National paid to and on behalf of Mr. Cleland. Mr. Cleland's wife was employed by the School Board and covered by a policy of health insurance issued by Washington National to the School Board. The health insurance policy contained a reimbursement provision. It is not disputed that the Clelands signed a separate reimbursement provision approximately one month after Mr. Cleland's October 1991 accident. Washington National paid $360,188.60 for medical expenses in the years after the accident. Through their attorney, the Clelands entered into a settlement agreement with their un/underinsured motorist carrier, Automobile Insurance Company of Hartford Connecticut, a wholly owned subsidiary of Travelers Property Casualty Corporation (Travelers), for the sum of $600,000.00. Neither the School Board nor Washington National was made a payee on the settlement check. The Clelands kept the money and did not reimburse the School Board or Washington National despite the reimbursement agreement.
The School Board and Washington National filed a "Supplemental and Amending Petition of Intervention and Declaratory Judgment." The trial court did not rule on the School Board and Washington National's petition until the conclusion of the Cleland's main demand. Although the trial court found that the reimbursement agreement entered into by the Clelands, the School Board and Washington National was valid, it ultimately concluded the School Board and Washington National were not entitled to reimbursement under the terms of the agreement. A judgment incorporating the trial court's finding on this issue was signed on August 3, 2001, and filed on August 7, 2001. The trial court did not address the issue of whether the School Board and Washington National still owed the Clelands health insurance benefits. It is from this judgment that the School Board and Washington National appeal.

III.

LAW AND DISCUSSION
Expert Testimony/Daubert
The Clelands assert that the trial court erred in admitting the testimony of defense witness Dr. Krenrich. They argue that Dr. Krenrich was not properly qualified as an expert and that his opinions were not based on "demonstrated and acceptable scientific principle." In other words, the Clelands assert that the trial *694 court failed to adhere to the Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and State v. Foret, 628 So.2d 1116 (La.1993) gatekeeping function. In connection with their assertion that the trial court improperly allowed Dr. Krenrich to testify, the Clelands urge that the probative value of his testimony was substantially outweighed by its unfair prejudicial effect. The defendants assert that the trial court's admission of Dr. Krenrich's testimony as an expert was proper under Daubert/Foret and La.Code Evid. arts. 702 regarding expert testimony and 403 regarding exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.
The trial court allowed Dr. Krenrich to testify as an expert in emergency room medicine, physics, and biomechanical engineering and in particular to testify about mechanical forces of the accident and how those forces were insufficient to cause any of Mr. Cleland's injuries. The starting point for analyzing the trial court's actions is La.Code Evid. art. 702 which states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Comment (d) to La.Code Evid. art. 702 states that the trial judge should have "[b]road discretion ... accorded ... in his determination as to whether expert testimony should be held admissible and who should or should not be permitted to testify as an expert." With respect to who should be allowed to testify as an expert, well-established case law supports the trial court's great discretion and no reversal of the trial court's decision on appeal absent clear error. Mistich v. Volkswagon of Germany, Inc., 95-939 (La.1/29/96); 666 So.2d 1073, on rehearing on other grounds, 95-939 (La.11/25/96); 682 So.2d 239; Massie v. Cenac Towing Co., Inc., 00-1596 (La.App. 3 Cir. 4/25/01); 796 So.2d 14, writ denied, 01-1511 (La.8/31/01); 795 So.2d 1213. Manifest error is only found when the court was clearly wrong in accepting expert's opinion upon which it relied. Tullis v. Rapides Parish Police Jury, 95-905 (La.App. 3 Cir. 1/17/96); 670 So.2d 245, writ not considered, 96-0444 (La.3/29/96); 670 So.2d 1241. Louisiana has adopted the United States Supreme Court's interpretation of Federal Rule of Evidence 702, which mirrors La. Code Evid. art. 702. Foret, 628 So.2d 1116; White v. State Farm Mut. Auto. Ins. Co., 95-551 (La.App. 3 Cir. 7/17/96); 680 So.2d 1; Daubert, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. Daubert calls upon trial courts to perform a gatekeeping function by deciding whether the expert scientific evidence or testimony is both reliable and relevant. Daubert, 509 U.S. at 588, 113 S.Ct. at 2794.
In Daubert, the Court overruled the well-known case on admissibility of scientific expert testimony, Frye v. United States, 293 F. 1013 (D.C.Cir.1923), that held that such testimony is inadmissible unless it is based on a scientific technique that is "generally accepted" as reliable in the relevant scientific community. Daubert overruled Frye on the ground that Frye's "general acceptance" test is inconsistent with the more liberal approach of Rule 702 of the much later-adopted Federal Rules of Evidence. Daubert also held that, even under Rule 702, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. at 589, 113 S.Ct. at 2795.
*695 The trial court in fulfilling its gatekeeping function with respect to admitting expert testimony should consider the following non-exclusive factors: 1) whether a theory or technique "can be (and has been tested)"; 2) "whether the theory or technique has been subjected to peer review and publication"; 3) "the known [or] potential rate of error" in using a particular scientific technique "and the existence and maintenance of standards controlling the technique's operation"; 4) whether the theory or technique has been generally accepted in the particular scientific field. Daubert, 509 U.S. at 593-94, 113 S.Ct. 2797. The Daubert court introduced its four "general observations" by stating: "Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test." Daubert, 509 U.S. at 593, 113 S.Ct. at 2797. The court concluded its list of four general observations by stating: "The inquiry envisioned by Rule 702 is, we emphasize, a flexible one." Thus, the "general observations" listed in Daubert are not a list of requirements that must be met in each instance of proposed expert testimony or even a list of factors that are necessarily applicable to all types of expert testimony. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Therefore, we read the Foret court's adoption of Daubert in light of the foregoing.
In the present case, the trial judge conducted what he termed a "Daubert hearing" outside of the jury's presence. As noted above, a Daubert hearing is used to determine if the scientific basis of an expert's testimony is sound. Stated differently, is the methodology supporting the expert's conclusions reliable and relevant? At the Daubert hearing, Dr. Krenrich testified that the basis of his opinion involved biomechanics and Newtonian physics that predict how objects will move or their motion change under specific circumstances. He also testified that biomechanics and Newtonian physics would allow him to testify as to what happened to Mr. Cleland's body when he collided with the vehicle operated by Mr. Jones.
Although at the outset the trial judge termed the hearing involving Dr. Krenrich a Daubert hearing, a thorough reading of the transcript of that hearing reveals that in fact it was not a Daubert hearing. In essence, the hearing merely questioned the proposed expert's qualifications as an expert in his particular fields as opposed to the scientific validity of the methodology underlying his opinion in the case. Moreover, the trial judge admonished plaintiff's counsel that the issue at the hearing was whether Dr. Krenrich "possess[ed] the qualifications to give opinions." An expert's qualifications to give an opinion is not the purpose of a Daubert hearing. It appears, although it is not very clear, that Dr. Krenrich's expert testimony was to be based on biomechanical and "Newtonian" physics theories. The trial judge failed to consider any of the required factors for assessing the evidentiary reliability of biomechanics and/or Newtonian physics in side-impact vehicle collisions to occupants of those vehicles nor was there any focus on the principles and methodology of those theories. The trial court simply focused on Dr. Krenrich's educational background and experiences. Information about Dr. Krenrich's qualifications to testify about his findings based on certain tests was insufficient to establish the evidentiary reliability of those tests as required by Daubert/Foret. Thus, because the defendants failed to establish the evidentiary reliability of Dr. Krenrich's methodology in determining the possible injury to a person involved in a side-impact vehicle collision or even to make clear what *696 methodologies and/or theories Dr. Krenrich relied upon, his testimony should not have been admitted.

Allocation of Fault
The Clelands contest the allocation of thirty-one percent of the fault for causing the accident to Mr. Cleland. On the other hand, the City contends that the jury erred in finding Mr. Jones sixty-nine percent at fault in causing the accident. Apportionment of fault is a question of fact, subject to the manifest error/clearly wrong standard of review. Sims v. State Farm Auto Ins. Co., 98-1613 (La.3/2/99); 731 So.2d 197. In reviewing allocation of fault, the Louisiana Supreme Court in Clement v. Frey, 95-1119, p. 7 (La.1/16/96); 666 So.2d 607, 610-11, explained, "there is an analogy between excessive or inadequate quantum determinations and excessive or inadequate fault percentage determinations. In both, the trier of fact, unlike the appellate court has had the benefit of witnessing the entire trial and of reviewing first hand all the evidence." Thus, we must determine whether the jury in the present case was clearly wrong or manifestly erroneous in the allocation of fault between the parties.
We have examined the record and find no manifest error by the jury in determining that Mr. Jones was sixty-nine percent at fault and Mr. Cleland was thirty-one percent at fault for the accident. There was testimony that Mr. Cleland could have avoided the accident. It is apparent that the jury believed that testimony; thus, there is no merit to this contention.
Quantum
The Clelands contend that the damages awarded to Mr. Cleland by the jury are inadequate. The City asserts that the Clelands were awarded the damage amount directly related to the injuries Mr. Cleland sustained in the accident of October 18, 1991, and that the amount was adequate to compensate the Clelands. The ordinary standard for an appellate court's review of damages was well established in Reck v. Stevens, 373 So.2d 498 (La.1979) and was confirmed in Youn v. Maritime Overseas, Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Suffice it to say, we will not disturb a trial court's award of damages unless we find that the award constitutes an abuse of the trial court's discretion. However, in the present case, we find that the jury verdict is tainted due to a material legal error made by the trial judge. Therefore, the verdict is untrustworthy and must be overturned. However, when an otherwise complete trial record exists, the general rule is that the appellate court should, if it can, conduct a de novo review of the record and render a judgment. Jones v. Black, 95-2530 (La.6/28/96); 676 So.2d 1067.
The Clelands request that this court reverse the judgment of the trial court and remand this case for further proceedings. Only when a view of the witnesses is essential to a fair resolution of conflicting evidence should the case be remanded for a new trial. Jones, 676 So.2d 1067 (citing Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707 (La.1980)). As we noted above, the trial judge qualified Dr. Krenrich as an expert in the fields of emergency room medicine, physics and biomechanics. He testified that the "partial impact collision" or "sideswipe impact" that occurred between the vehicles operated by Mr. Cleland and Mr. Jones on October 18, 1991, was not strong enough to cause the extent of damages suffered by Mr. Cleland. Dr. Krenrich used his expertise to describe how Mr. Cleland's body *697 would have moved during the accident. He further opined that it was unlikely that Mr. Cleland hit his head on any part of his vehicle; thus, there was no "mechanism for any type of head injury." Dr. Krenrich further testified that there was no way Mr. Cleland suffered any type of neck, back, knee, or ankle injury in the accident.
It is clear from the jury's verdict that it found that Mr. Cleland suffered some type of injury because they awarded him the amount of $5,000.00 in general damages and the amount of $869.50 for payment of past medical expenses. It is also clear from the record that Mr. Cleland suffered for many years with a myriad of physical problems due to other accidents prior to the October 18, 1991 accident that is the subject of the present appeal. We note that the jury could have found that the October 1991 accident only caused a slight aggravation of his previous problems; thus, it did not award a larger amount in general damages or the entire amount of Mr. Cleland's medical expenses. However, because this was a jury trial, we do not know the weight the jury attached to Dr. Krenrich's testimony in reaching their decision. Faced with only the cold record and conflicting evidence as to whether Mr. Cleland was injured in the accident, we are convinced that this case must be remanded to the trial court for a new trial on the issue of the amount of damages.
Trial Court Assessment of Costs
The City and Mr. Jones contend that the trial court erred in assessing them with one-hundred percent of the court costs. Under La.Code Civ. P. art. 1920, "the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable." See, Adams v. Canal Indem. Co., 99-1190 (La. App. 3 Cir. 5/10/00); 760 So.2d 1197, writ denied, 00-1636 (La.9/22/00); 769 So.2d 1212, 00-1637 (La.9/22/00); 769 So.2d 1213. Under this statute, the trial judge has great discretion in awarding costs, and his assessment of costs can be reversed by the appellate court only upon a showing of an abuse of discretion. George v. Reliance Ins. Co., 01-1336 (La.App. 3 Cir. 6/5/02); 819 So.2d 453. As a general rule, a party cast in judgment is taxed with costs of the proceedings. Adams, 760 So.2d 1197.
In light of the fact that Mr. Cleland prevailed on his claim, albeit not in an amount he thought appropriate, and the great discretion allowed the trial court in taxing court costs, we cannot say that the trial court abused this great discretion in taxing all costs to the City and Mr. Jones. As such, the decision of the trial court to tax the City and Mr. Jones with all costs was not in error.

Reimbursement of Medical Expenses Paid by the School Board and Washington National
In the years following Mr. Cleland's October 18, 1991 accident, the School Board and its health insurance provider, Washington National, paid the Clelands $360,188.60 for medical expenses incurred by Mr. Cleland. The School Board and Washington National assert that they are entitled to be reimbursed by the Clelands from funds they received in a settlement with their un/underinsured motorist carrier pursuant to a reimbursement agreement found to be valid by the trial court. Although the trial court concluded that the reimbursement agreement was valid, it nevertheless concluded that the School Board and Washington National were not entitled to reimbursement under the terms of that agreement because the "uninsured motorist carrier was not a `third party' as defined by the reimbursement provision of the policy." The reimbursement provision in question is as follows:
Reimbursement
*698 There shall be no coverage for expenses incurred by an Insured:
1. as a result of an injury or sickness which is claimed by the insured to have been the result of an act or omission of a third party; and
2. for which payment is made to or on behalf of the Insured by such third party.
If a claim is made to the Company for expenses:
1. covered under the policy; and
2. for which, in the opinion of the Company, a third party may be liable;
the Company will pay benefits, provided the Insured agrees, in writing, to reimburse the Company when payment is made by such third party.
The Company's right to reimbursement will be limited to the lesser of:
1. the amount of benefits paid by the Company; or
2. the amount paid by the third party which represents reimbursement to the Insured for such expenses.
Any payment for reimbursement of expenses incurred as a result of injury or sickness which is made by a third party's insurance carrier(s) will be deemed to be payment by the third party ...
The Clelands also signed a separate reimbursement provision agreeing to "reimburse Washington National ... for payments made to [them] by a third party on account of said injury or sickness."
The issue of whether the Clelands owe the School Board and Washington National reimbursement for funds paid by the School Board and its health care insurance provider turns on interpretation of the reimbursement agreements. More specifically, the issue turns on the interpretation of "third party" in the reimbursement agreements of the insurance policy. Interpretation of an insurance contract is a question of law. Minor v. Casualty Reciprocal Exchange, 96-2096 (La. App. 1 Cir. 9/19/97); 700 So.2d 951, writ denied, 97-2585 (La.12/19/97); 706 So.2d 463. Further, statutory interpretation is a question of law. Shell v. Wal-Mart Stores, Inc., 00-0997 (La.App. 3 Cir. 3/21/01); 782 So.2d 1155, writ denied, 01-1149 (La.6/15/01); 793 So.2d 1244. Appellate review of questions of law is simply to determine whether the trial court was legally correct or legally incorrect. City of Baker Sch. Bd. v. East Baton Rouge Parish Sch. Bd., 99-2505 (La.App. 1 Cir. 2/18/00); 754 So.2d 291. The parties do not dispute that the agreements are valid. The common intent of the parties guides the interpretation of a contract. La.Civ. Code art.2045. If the words of a contract are clear, explicit, and lead to no absurd results, its interpretation is constrained to the "four corners" of the document. Hebert v. Insurance Ctr. Inc., 97-298 (La.App. 3 Cir. 1/7/98); 706 So.2d 1007, writ denied, 98-353 (La.3/27/98); 716 So.2d 888. The court must determine whether the words of a contract are clear or whether they are ambiguous because this is a question of law, not fact. Id. The intention of the parties is to be determined in accordance with the plain, ordinary, and popular sense of the language used in the agreement and by giving consideration on a practical basis to the instrument in its entirety. Coates v. Northlake Oil Co., Inc., 499 So.2d 252 (La.App. 1 Cir.1986), writ denied, 503 So.2d 476 (La.1987). Additionally, any ambiguity as to the meaning provided in the provisions is to be interpreted against the insurer as drafter of the contract. La.Civ.Code art.2056; Livas v. State Farm Mut. Ins. Co., 99-1169 (La. App. 1 Cir. 7/18/00); 797 So.2d 694.
The term "third party" is not defined in the policy. However, here the reimbursement provisions specifically and clearly *699 state that the third party is the one whose act or omission caused harm to the insured. The agreements further state that if the third-party tortfeasor's insurer makes payments to the injured insured, Washington National is entitled to reimbursement of the funds it expended from that source. The contract says absolutely nothing about Washington National being reimbursed when its injured insured receives funds for medical expenses from another type of insurance policyhere Mr. Cleland's un/underinsured motorist providernot connected to the original tortfeasor. Further, in Washington National Insurance Co. v. Brown, 94-1346 (La.App. 1 Cir. 4/7/95); 654 So.2d 724, writ denied, 95-1699 (La.10/13/95); 661 So.2d 497, although one of the issues in the case was whether the agreement entered into by the parties was one of subrogation or reimbursement, the same language in the Clelands' reimbursement agreement was used in Brown. The first circuit stated that the "clause ... requires the insured to pay back the insurer from the amount the insured recovers from the true debtor." Id. at 727. Washington National paid Mr. Cleland's medical bills with the understanding that if it was later determined that a third party was responsible and he recovered medical costs from that third party, he would then reimburse the medical costs paid by Washington National. This interpretation comports with the policy of requiring the actual person responsible for causing damages to repair that damage. La.Civ.Code art. 2315.
Thus, we find no error in the trial court's conclusion that the School Board and Washington National are not entitled to reimbursement from the settlement funds the Clelands received from Mr. Cleland's un/underinsured motorist carrier. In connection with this conclusion, we find that the trial court correctly found that any medical expenses awarded the Clelands in their suit against the tortfeasors are reimbursable to the School Board and Washington National. However, due to our decision to reverse the damage portion of jury's verdict and remand on the issue of damages, there are no medical expense funds from which Washington National can be reimbursed. Likewise, our decision on the damage portion of this case pretermits a discussion regarding the School Board and Washington National's assignment of error pertaining to the inadequacy of the jury's damage award.
The School Board and Washington National also contend that the trial court erred in failing to render a judgment declaring that the School Board no longer owes health insurance benefits to the Clelands. The trial court's failure to address this issue is a rejection of the relief requested on the issue. Livings v. Langston Companies, Inc./Continental Bag Div., 96-636 (La.App. 3 Cir. 12/5/96); 685 So.2d 405. Further, the presumption is that the trial court was correct in rejecting the requested relief. Nyquist v. Jefferson Parish Sheriff's Office, 01-1378 (La.App. 5 Cir. 5/15/02); 821 So.2d 39, writ not considered, 02-1686 (La.10/4/02); 826 So.2d 1112 (citing Karisny v. Sunshine Biscuits, Inc., 215 So.2d 201 (La.App. 3 Cir.1968)). The burden is on the plaintiff to prove otherwise. Id. The School Board and Washington National argue that the Clelands breached their contractual agreement to reimburse them under both the insurance policy and the separate reimbursement agreement, and therefore, the Clelands are no longer owed any health benefits. It is apparent that the trial court, finding that the Clelands did not owe reimbursement to the School Board and Washington National, concluded that no breach of contract occurred and, therefore, were still owed health insurance benefits. We agree and find no merit to the *700 School Board's and Washington National's position.

IV.

CONCLUSION
For the above reasons, the judgment of the trial court is affirmed insofar as it holds that Terry Cleland was thirty-one percent at fault and Jones was sixty-nine percent at fault in causing the motor vehicle accident on October 18, 1991, and insofar as it assessed one-hundred percent of the court costs to the City of Lake Charles and Gerard Jones. Further, the trial court judgment is affirmed with respect to its holding that Terry and Ruth Cleland do not owe reimbursement to the Calcasieu Parish School Board and its health care insurer, Washington National Insurance Company, from funds paid to them by Terry Cleland's un/underinsured motorist insurance and in not declaring that the Calcasieu Parish School Board no longer owes the Terry and Ruth Cleland health insurance benefits. The trial court judgment is reversed and set aside insofar as it concludes that the testimony of expert witness, Dr. Scott Krenrich was properly admitted and with respect to the damage amount awarded. The matter is remanded to the trial court for the purpose of conducting a trial solely on the issue of general and special damages. All costs are assessed to defendants, the City of Lake Charles, the Calcasieu Parish School Board, and Washington National Insurance Company in the amount of $11,180.50.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.